IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JAMES LANCASTER et al. | CIVIL ACTION |
|---|---|
| v. | NO. 16-842 |
| PJM INTERCONNECTION, LLC | |

### MEMORANDUM RE DEFENDANT'S MOTION TO DISMISS

### I.  INTRODUCTION

In this employment dispute, defendant PJM Interconnection, LLC ("PJM" or "Defendant") moves to dismiss plaintiffs' James Lancaster ("Mr. Lancaster") and William Lebus ("Mr. Lebus" and together with Mr. Lancaster, "Plaintiffs") Amended Complaint, in which Mr. Lancaster and Mr. Lebus each assert, respectively, that PJM violated the Fair Labor Standards Act of 1938 ("FLSA" or the "Act")), 29 U.S.C. § 201 *et seq.*, by retaliating against Messrs. Lancaster and Lebus for filing a complaint seeking adequate compensation for "time on call." For the following reasons, PJM's motion to dismiss is denied.

### II.  FACTUAL ALLEGATIONS & PROCEDURAL HISTORY

For the purposes of resolving Defendant's motion to dismiss, the Court assumes all facts pleaded in Plaintiffs' Amended Complaint to be true.  In addition, the Court relies on two writings annexed to Defendant's Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Amended Complaint (ECF 12).  The Third Circuit has recognized that a district court ruling on a motion to dismiss may consider "a 'document *integral to or explicitly relied* upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment.'" In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (alteration in original) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).  Thus, it is

1

proper to consider these materials to the extent they are incorporated by reference in, and are integral to, Plaintiffs' Amended Complaint.

**A.      Plaintiffs' Employment and Work Schedule History with PJM**

Mr. Lancaster was employed by PJM as a Senior Engineering Technician ("SET") in its Facilities Services Department from October 1, 1994 to December 2, 2014.  (Am. Compl. ¶¶ 10-11).  Mr. Lancaster's responsibilities at PJM included "providing engineering and technical support for voice communications," and "ensur[ing] the safe and reliable operation of" a "high-voltage electricity grid" managed by PJM for approximately 61 million people (the "Power Grid").  (Am. Compl. ¶¶ 4, 11).  Mr. Lancaster received positive performance reviews and ratings throughout his decades-long employment with PJM.  (Am. Compl. ¶¶ 13-16).  Mr. Lebus was also employed by PJM as an SET in the Facilities Services Department from July 20, 1998 until December 2, 2014.  (Am. Compl. ¶¶ 17-18).  And, like Mr. Lancaster, Mr. Lebus received positive performance reviews while employed by PJM.  (Am. Compl.  ¶¶ 21-23).

Mr. Lebus, together with Mr. Lancaster and non-party Jay Stauffer ("Mr. Stauffer"), comprised a three-person team of SETs assigned to the Facilities Services Department (the "FSD Team").  (Am. Compl. ¶ 25).  Before 2014, the FSD Team reported to David Spangler, PJM's Facilities Manager.  (Am. Compl. ¶ 52).  When Mr. Spangler was promoted to Director of Facilities Services at PJM, William Franks succeeded Mr. Spangler as Facilities Manager, and thus became the FSD Team's supervisor.  (Am. Compl. ¶¶ 53-54).  Mr. Franks, in turn, reported to Mr. Spangler.  (Am. Compl. ¶ 56).

The FSD Team was scheduled to work forty (40) hours per week at their regular pay rate. (Am. Compl. ¶ 26).  In addition to this compensation, members of the FSD team, including Plaintiffs, were each eligible for overtime compensation pursuant to the FLSA for time worked

in excess of forty hours per week, at the rate of not less than one and one-half times their regular pay rate. (Am. Compl. ¶ 27). Pursuant to guidelines and standards adopted by the North American Electric Reliability Corporation ("NERC"), PJM maintained a written policy requiring the FSD Team to be available at any time of the day or night in case there was a loss of critical telecommunications. (Am. Compl. ¶ 33). According to NERC guidelines and because the FSD Team was essential to maintaining the safety and reliability of the Power Grid, PJM called and contacted Plaintiffs at all hours of the day and night, including on weekends and holidays. (Am. Compl. ¶ 30). The tasks Plaintiffs completed in overtime included traveling to job sites, "troubleshooting" time-sensitive issues via telephone, and logging into PJM's Virtual Private Network ("VPN"). (Am. Compl. ¶ 32). PJM compensated Plaintiffs for this overtime work according to the appropriate overtime pay rate. (Am. Compl. ¶ 29).

In order to be available to complete this overtime work, the FSD Team needed to spend a substantial amount of "time on call" waiting to be called to perform required tasks. (Am. Compl. ¶ 34). PJM instructed the FSD Team to rotate their time on call so that one FSD Team member was available at all times to handle and respond to emergencies affecting the Power Grid. (Am. Compl. ¶ 35). Whenever an FSD Team member was on call, the requirement proved so restrictive that Plaintiffs could not "go[] away on vacation, travel[] by air or boat, attend[] religious and church services . . . consum[e] alcoholic beverages (even socially)," and prevented both "Plaintiffs and their family members from sleeping soundly and without interruption." (Am. Compl. ¶ 38). In order to best facilitate the on-call requirement, Plaintiffs provided PJM with their personal cellular and home telephone numbers. (Am. Compl. ¶ 40).

### B.     PJM's "On-Call" Policy

PJM has implemented a formal, written on-call policy since 2003.  (Am. Compl. ¶ 41). In 2008, PJM's on-call policy was superseded by a policy styled "On-Call and Overtime," which was updated and revised in January 2013 (the "On-Call Policy").  (Am. Compl. ¶¶ 42-43). PJM's On-Call Policy provided employees subject to the policy with a "standard on-call premium [of] $300 per week" during the weeks on which members of the FSD Team were designated as "on-call."  (Am. Compl. ¶ 45).  In addition to the $300 premium, the On-Call Policy mandated that a PJM employee designated "on-call" was also "eligible for overtime . . . when they respond[ed] to an after-hours call."  (Am. Compl. ¶ 46).

On March 17, 2014, PJM and Mr. Franks determined that the FSD Team would receive compensation in accordance with the On-Call Policy during weeks FSD Team members were designated as "on-call."  (Am. Compl. ¶ 57).  Therefore, from March 2014 to Plaintiffs' termination on December 2, 2014, Plaintiffs received the $300 premium during weeks they were designated "on-call" according to their rotating schedule.  (Am. Compl. ¶¶ 58-59).  The FSD Team members' on-call responsibilities and workload did not change, but the compensation they received during weeks spent "on-call" *did* change with this decision.  (Am. Compl. ¶ 60).

### C.     Plaintiffs' Letter of Complaint

Recognizing that PJM's decision to compensate the FSD Team according to the On-Call Policy was prospective only, on May 27, 2014 Plaintiffs delivered to Mr. Franks a letter protesting and complaining about PJM's failure to provide such compensation for Plaintiffs' time spent on call *before* March 2014 (the "Letter of Complaint" or "Letter").  (Am. Compl. ¶¶ 64-66).  In September 2014, Mr. Franks delivered the Letter of Complaint to Maureen McCormick,

4

PJM's Manager of Compensation & Benefits, who then forwarded the Letter to Mr. Spangler. (Am. Compl. ¶¶ 67-68).

In their Letter of Complaint, Plaintiffs made the following claims: first, that the FSD Team only started receiving on-call availability compensation March 17, 2014; second, that the FSD Team had been delivering on-call service for "quite some time"; and therefore third, that this change in compensation policy did not address the issue of "[n]on-compensation for services provided [by the FSD Team] in prior years." (ECF 12, Def.'s Mot. to Dismiss Pls.' Am. Compl. ("Defs.' Br."), Ex. B ("Compl. Lttr."), at 1). Plaintiffs each provided personal anecdotes regarding their time on-call experiences. Mr. Lancaster described that "[w]hen home computers were implemented for employee's access to PJM's systems . . . the [SETs] were one of the first to have them installed in their home" so that SETs could have "another tool to communicate with [d]ispatch for any operational issues." (Compl. Lttr. at 4). Mr. Lancaster recounted how, after the terrorist attack on September 11, 2001, PJM management informed SETs that "answering their cell phones for company calls was no longer a courtesy, but a necessity." (Compl. Lttr. at 4). Mr. Lebus noted that "[h]e clearly understood that the new PJM job required responding to emergency call-outs to support [d]ispatch operaters." (Compl. Lttr. at 5).

In addition to providing anecdotal evidence of the intrusiveness of PJM's On-Call Policy, the Letter of Complaint stated that "[t]he [s]hift [s]upervisors do not hesitate to call any or all the [SETs] at any hour on any weekend or holiday if a situation arises on a piece of equipment that can compromise in any way the safe and reliable operation of the power grid," and that "'On-Call' compensation helps to make up to [SETs] for some of their inconvenience and patience." (Compl. Lttr. at 3, 4). Finally, recognizing that on-call compensation had been part of PJM's On-Call Policy for some time, the Letter of Complaint found it "puzzling that the PJM security

personnel received 'On-Call' compensation while the on-site responders from the Facilities Department did not." (Compl. Lttr. at 2).

PJM scheduled a meeting to discuss the Letter of Complaint with Plaintiffs. (Am. Compl. ¶ 75). Messrs. Spangler, Franks, Stauffer, and Plaintiffs attended the meeting, held in October 2014. (Am. Compl. ¶ 76). At this meeting, Mr. Spangler informed Plaintiffs that PJM was denying the request, made in the Letter of Complaint, for retroactive application of the On-Call Policy. (Am. Compl. ¶ 77). In addition, Mr. Spangler informed Plaintiffs that PJM would be investigating Plaintiffs' claimed hours of overtime, as indicated on Plaintiffs' weekly time records. (Am. Compl. ¶ 79). Also at this meeting, Plaintiffs reiterated—orally to Mr. Spangler—that they were entitled to compensation for their time on call, prior to March 17, 2014. (Am. Compl. ¶ 80). Finally, at the meeting Mr. Spangler directed that Plaintiffs prepare and submit a written description of an SETs job responsibilities. (Am. Compl. ¶ 83). After pressure from Messrs. Spangler and Franks to submit this description, Plaintiffs submitted the position description to PJM on December 1, 2014 (the "Position Statement" and together with the Letter, the "FLSA Letters"). (Am. Compl. ¶¶ 87-88). The Position Statement provides that PJM engineer technicians "[a]lways have provided 24x7 emergency callout services," with "over 200 documented callout/emergencies so far this year" and exhibit a "[w]illingness to be 'On-Call' per company policy." (Def.'s Br., Ex. B ("Position Statement") at 1).

**D.      PJM Terminates Plaintiffs**

On December 2, 2014, one day after Plaintiffs submitted their Position Statement, PJM required Plaintiffs to attend a meeting to discuss the Position Statement. (Am. Compl. ¶ 94). At this meeting, PJM told Plaintiffs that Plaintiffs would also be meeting with Human Resources ("HR") to discuss Plaintiffs' time records. (Am. Compl. ¶ 95). Plaintiffs then met separately

with Mr. Spangler, Mr. Franks, and Teo Diaz ("Mr. Diaz"), who worked in PJM's HR department (collectively, the "Termination Meetings").  (Am. Compl. ¶ 96).  At these Termination Meetings, PJM accused Plaintiffs of padding and/or inflating their time records to get overtime Plaintiffs were not entitled to, and informed Plaintiffs that their employment with PJM was being terminated.  (Am. Compl. ¶¶ 97-98).  Mr. Lancaster, upon learning that he was being terminated, told Mr. Spangler "you got me good," to which Mr. Spangler responded, "you got yourself good when you wrote that letter."  (Am. Compl. ¶ 104).

E.     **Procedural History**

Plaintiffs commenced this action by filing a complaint in this Court on February 22, 2016 (the "Complaint").  (ECF 1).  PJM moved to dismiss the Complaint on April 21, 2016 (ECF 6), to which Plaintiffs responded on May 5, 2016 (ECF 9).  Because Plaintiffs filed an Amended Complaint as of right on May 5, 2016 (ECF 10, the "Amended Complaint"), this Court denied PJM's motion to dismiss the Complaint as moot on May 9, 2016 (ECF 11).  PJM then moved to dismiss Plaintiffs' Amended Complaint on May 20, 2016.  (ECF 12).  On June 6, 2016, Plaintiffs opposed PJM's Second Motion to Dismiss.  (ECF 13, Pls.' Opp'n to Def.'s Second Mot. to Dismiss ("Pls.' Opp'n")).  PJM replied in further support of its motion to dismiss on June 16, 2016.  (ECF 14, Def.'s Reply in Supp. of Second Mot. to Dismiss ("Def.'s Reply")).

### III.  JURISDICTION & VENUE

This Court has jurisdiction over Plaintiffs' federal statutory claims pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b).

### IV.  STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff."  Warren Gen.

Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## V.  DISCUSSION

Under the FLSA, it is unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the Act.  29 U.S.C. § 215(a)(3).  In order to state a claim for retaliatory discharge under the FLSA, a plaintiff must plead (1) that she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal link between the plaintiff's protected action and the employer's adverse action.  Preobrazhenskaya v. Mercy Hall Infirmary, 71 Fed. App'x 936, 939 (3d Cir. 2003).   In analyzing unlawful retaliation under the FLSA, the Court applies the McDonnell-Douglas burden-shifting framework.  Cononie v. Allegheny Gen. Hosp., 29 Fed. App'x 94, 95 (3d Cir. 2002).

In its motion, PJM argues that Plaintiffs have insufficiently pleaded the first element of a claim for FLSA retaliatory discharge because Plaintiffs' requests to be retroactively paid overtime for "time waiting on call" do not constitute "protected activity" under the FLSA. Therefore, the sole issue before the Court is whether Plaintiffs' oral and written complaints, taken together, were sufficient to notify PJM that Plaintiffs were complaining of rights protected under the FLSA.

For an employee's complaint to be protected, it "must be sufficiently clear and detailed for a reasonable employer to understand it . . . as an assertion of rights protected by the statute

and a call for their protection." Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 14 (2011). Furthermore, the Third Circuit has held that the language of § 215(a)(3) of the FLSA should be interpreted liberally. Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987). In so holding, the Third Circuit explained that, the FLSA "is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted." Id. District courts in this Circuit, in accordance with a majority of circuits, have concluded "that an informal assertion of rights under FLSA to an employer triggers protection under the language of § 215(a)(3)." Coyle v. Madden, No. 03-4433, 2003 WL 22999222, at *3 (E.D. Pa. Dec. 17, 2003) (collecting cases); accord Jones v. Amerihealth Caritas, 95 F. Supp. 3d 807, 814 (E.D. Pa. 2015) (finding "sufficiently pleading an informal complaint to an employer may qualify as protected activity under § 215(a)(3)."). The plaintiff need not directly invoke the FLSA in the complaint. Childs v. Universal Cos., No. 15-3507, 2016 WL 1623159, at *4-5 (E.D. Pa. Apr. 22, 2016) (Baylson, J.).

In arguing for dismissal of Plaintiffs' action, PJM cites a body of law developed in the Second Circuit which stands for the proposition that "the FLSA neither converts an employer's contract breach into a violation of federal law, nor generally federalizes disputes between employers and employees." Dunn v. Sederakis, 143 F. Supp. 3d 102, 111 (S.D.N.Y. 2015) (collecting cases). In Dunn, the district court considered the plaintiff employee's written and oral complaints. Id. at 110. While the plaintiff's written complaints did not concern wages or compensation, her oral complaints alleged an unpaid retroactive pay increase pursuant to a contract between her union and her employer. Id. As to these oral complaints, the court determined that the plaintiff had only put her employer on notice that she "believed she had not

been paid what her employer had promised," but did not complain about what the FLSA protects against. Id.

The Dunn plaintiff also complained to her employer "about unpaid overtime, docked wages, or both." Id. at 111. As to the plaintiff's complaints about unpaid overtime, the court determined that such complaints have "the potential to satisfy the [Greathouse v. JHS Sec. Inc., 784 F.3d 105 (2d Cir. 2015)] standard, because the FLSA does convey a right to overtime pay." Id. In dismissing the plaintiff's FLSA retaliation claim, the court stated "[i]t is significant that [the plaintiff] was contemporaneously complaining about [her employer's] docking of her wages and its refusal to grant a retroactive pay increase, both of which appear to have implicated internal issues of discipline and contract, rather than statutory violations." Id. at 113.

The Court is unpersuaded by this reasoning, as it conflicts not only with the Third Circuit's mandate for a "liberal interpretation" of FLSA complaints, but also Supreme Court precedent. In Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 740, the Supreme Court stated:

> This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate.

Barrentine, 450 U.S. at 740.

Here, Plaintiffs' Letter pinpoints two possible ways in which PJM's compensation policy for SETs violated, or continues to violate, the FLSA. Only one such complaint is of relevance here, namely the Letter's explicit allegation that, even though SETs were subject to an extremely intrusive "time on call" requirement, they were not compensated for this "time on call." (Compl.

Lttr. at 1). The Third Circuit has recognized that "[t]he Department of Labor promulgated regulations stating that on-call time is compensable . . . if the employee, although not required to remain on the employer's premises, find that his time on-call away from the employer's premises is so restricted that it interferes with personal pursuits." Ingram v. County of Bucks, 144 F.3d 265, 268 (3d Cir. 1998) (citing 29 C.F.R. § 553.221(c), (d) and stating that "[t]he Department of Labor's regulation of the [FLSA] is entitled to substantial deference."). In their FLSA Letters, Plaintiffs provided enough information to put PJM on notice that they were complaining of inadequate overtime compensation for time spent on call because the on-call requirement so interfered with their personal lives.

In their Letter of Complaint, Plaintiffs provided anecdotal evidence of the ways in which PJM's on-call requirement interfered with their personal lives. (See, e.g., Compl. Lttr. at 3, 4). Indeed, the Complaint Letter indicates that the on-call requirement prevented Plaintiffs from "engag[ing] in personal activities," Ingram, 144 F.3d at 268, such as family get-togethers, religious observances, and vacations (Compl. Lttr. at 4). Further, Plaintiffs' Position Statement noted PJM's "inadequate" response to its Letter of Complaint, and cited the need to address "PJM's family/work balance values." (Position Statement at 28).

Finally, Plaintiffs also allege that, when Mr. Lancaster delivered Plaintiffs' Letter to Mr. Franks, Mr. Lancaster orally[1] informed Mr. Franks that PJM's failure to retroactively compensate Plaintiffs for time on call "was a violation of the wage laws." (Am. Compl. ¶ 66) (internal quotation marks omitted). Plaintiffs further allege that, when PJM told them that their

---

[1] Complaints regarding FLSA wage violations can be oral as well as written. Kasten, 563 U.S. at 14.

request for retroactive compensation was being denied, Messrs. Lancaster and Lebus "reiterated that they were entitled to the Overtime for Time On-Call." (Am. Compl. ¶ 80).[2]

Taken together, these oral and written complaints were sufficiently clear and detailed for PJM to understand, in both content and context, that Plaintiffs were asserting rights protected by the FLSA.

### VI.  CONCLUSION

In the Third Circuit, "the key to interpreting the anti-retaliation provision is the need to prevent employees' 'fear of economic retaliation' for voicing grievances about substandard conditions." Brock, 812 F.2d at 124 (quoting Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 292 (1960)).  The Court, hewing close to this guidance, concludes that Plaintiffs FLSA Letters constitute a "complaint" as understood by the FLSA.  Accordingly, Defendant's motion to dismiss is denied.

An appropriate Order follows.

O:\CIVIL 16\16-842 Lancaster v PJM Interconnection, LLC\Memo Denying Motion to Dismiss Amended Complaint.docx

---

[2]  Even according to Dunn, in which the district court dismissed the plaintiff's FLSA retaliation claim where she did not expressly voice violations of the FLSA, Plaintiffs' alleged oral complaints are sufficient to withstand a motion to dismiss as they specifically mention violations of the "wage laws."  Cf. Dunn, 143 F. Supp. 3d at 113 (finding plaintiff's oral complaints were insufficient because complaint did not allege the oral complaints "ever invoked the FLSA or accused [the employer] or its employees of illegality.").